WESTERN POWER CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 72943. Promulgated May 27, 1936.

*Edward H. Green, Esq.,* and *John A. Woodbridge, Esq.,* for the petitioner.
*DeWitt Evans, Esq.,* and *James K. Polk, Esq.,* for the respondent.

OPINION.

VAN FOSSAN: In this proceeding an original deficiency of $19,312.44 was asserted against the petitioner for the calendar year 1930. The petition alleges that respondent's determination is based upon the erroneous inclusion in taxable income of $286,152.83 as interest accrued on loans and advances, the disallowance of $9,657.47 as a depreciation deduction, and the disallowance of $3,159.35 as an amortization deduction of bond discount and expense.

By an amended answer, respondent, after denying the foregoing allegations of error, affirmatively alleged that the deficiency is $8,295,605.39, instead of $19,312.44, and asserted a claim for the additional deficiency of $8,276,292.95. Respondent's claim for the additional deficiency is based upon his failure to include in gross income "an amount of $88,969,107.89 ($68,969,107.89)', or such greater amount as may be determined, representing the profit from the sale by the petitioner in the year 1930 of certain shares of capital stock of four certain public utility companies, and the cancellation by petitioner of certain floating indebtedness of two of the companies to it."

If the respondent's determination that a sale occurred is sustained, an alternative issue of fact is presented, viz., the fair market value of a block of 1,825,000 shares of common stock of the Pacific Gas & Electric Co. on June 12, 1930.

Stipulations of fact, with documentary evidence attached, together with the testimony of numerous witnesses and exhibits, make up the record of this proceeding. The stipulations dispose of the issues relating to depreciation and amortization, and effect will be given thereto under Rule 50. As to the issues raised by the amended answer and reply and the $286,152.83 item, only those portions of the stipulated facts and the other facts of record that are deemed pertinent to the determination thereof appear in our findings.

The petitioner is a New York corporation, organized on June 5, 1915, whose business is investments in capital stock of public utility corporations. The petitioner's capitalization on June 12, 1930, was as follows:

| | Authorized shares | Outstanding shares |
|---|---|---|
| 7 percent preferred stock, par value $100 | 150,000 | 96,542 |
| Common stock, no par value | 325,000 | 321,978 |

Both classes of stock had full voting powers.

In the year 1930, the North American Co., a New Jersey corporation, owned approximately 321,486 shares of petitioner's outstanding common stock, or approximately 99.8 percent, but was not affiliated with it under the provisions of the Revenue Act of 1928

prior to December 17, 1930, because of outstanding voting preferred stock. The North American Co. was a large holding company of stocks and securities of public utility companies in various parts of the United States, principally in the District of Columbia, Virginia, Maryland, Ohio, Michigan, Wisconsin, Missouri, Illinois, Iowa, and California.

Immediately prior to the transactions hereinafter referred to the petitioner was the owner of certain shares of stock in the Great Western Power Co. of California, sometimes hereinafter referred to as Great Western, the San Joaquin Light & Power Corporation, sometimes hereinafter referred to as San Joaquin, and the Midland Counties Public Service Corporation, sometimes hereinafter referred to as Midland, all located in the State of California. The classes of stock, all with a par value of $100 per share, the number of authorized shares, the outstanding shares, and the number of shares owned by petitioner were as follows:

GREAT WESTERN

|  | Authorized shares | Outstanding shares | Owned by petitioner |
|---|---|---|---|
| Preferred stock | 150,000 | 129,278 | |
| Preferred stock, series A | 150,000 | 48,965 | |
| Common stock | 300,000 | 300,000 | 300,000 |

SAN JOAQUIN

|  | Authorized shares | Outstanding shares | Owned by petitioner |
|---|---|---|---|
| Prior preferred stock | 250,000 | 118,426 | 897 |
| Prior preferred stock, series A | 500,000 | 26,276 | 1,462 |
| Preferred series A | 185,000 | 64,684 | 45,159 |
| Preferred series B | 65,000 | 316 | |
| Common stock | 500,000 | 130,000 | 128,867 |

MIDLAND

|  | Authorized shares | Outstanding shares | Owned by petitioner |
|---|---|---|---|
| Preferred stock | 10,000 | 5 | 5 |
| Common stock | 20,000 | 10,000 | 10,000 |

All of the stock of each of the above companies had full voting powers and the percentage of voting stock of each company owned by the petitioner was as follows:

Great Western Power Corporation_____ 62.73%
San Joaquin Light & Power Co_____ 51.92%
Midland Counties Public Service Corporation_____ 100.00%

The petitioner acquired its stock in Great Western in 1918, and its stock in San Joaquin and Midland in 1925. No companies operating west of the Rocky Mountains, other than the above corporations and their subsidiaries, were controlled directly or indirectly by petitioner or the North American Co.

Great Western, San Joaquin, and Midland were operating companies engaged in the public utility business of electric light, electric

power, gas, and associated businesses in the State of California, more particularly described as follows:

The Great Western Power Co. of California system immediately prior to June 12, 1930, furnished electric light and power throughout a territory in central California of approximately 2,000 square miles with a population of 1,277,400. Included in the above are 44 communities, the principal cities of which are San Francisco, Oakland, Berkeley, Sacramento, Martinez, Richmond, Napa, Petaluma, and Santa Rosa. Central heating plants supply heat in San Francisco and Oakland.

In addition to owning and operating two hydro and four steam generating plants, Great Western contracted for the entire output of the Bucks Creek hydro plant, which is owned by the Feather River Power Co. It also had under lease a steam generating plant at Oakland from another subsidiary, California Electric Generating Co.

The total generating capacity of the hydro and steam plants of the Great Western system on December 31, 1929, was 249,400 kilowatts. The total amount of electricity produced in 1929 was 1,049,765,324 kilowatt-hours, of which 98.2 percent was produced by the hydro plants. In addition to the above production, 5,447,932 kilowatt-hours were purchased. There were received in interchange from San Joaquin 7,920,000 kilowatt-hours, and 197,538,000 kilowatt-hours were delivered to San Joaquin through interchange.

The San Joaquin Light & Power Corporation was incorporated in California on July 19, 1900, as a consolidation of the San Joaquin Light & Power Co., the Power, Transit & Light Co. of Bakersfield, and Merced Falls Gas & Electric Co. At June 12, 1930, it controlled, through stock ownership, the Bakersfield & Kern Electric Railway, the San Joaquin Light & Power Co., and the Valley Electrical Supply Co.

In addition to furnishing Midland with all its power, San Joaquin served a population of over 331,500, which embraced a territory of 9,062 square miles, including 175 communities in California, the principal cities and towns being Fresno, Bakersfield, Merced, Madera, Selma, Hanford, Sanger, Reedley, and Dinuba. It also operated a street railway system in Bakersfield, furnished water in Selma, and distributed gas in Bakersfield, Merced, and Selma.

The properties of San Joaquin included 13 hydro-electric and steam-electric generating stations with a total capacity of 231,602 horsepower, and a transmission and distribution system including 8,839 miles of electric lines and 213 miles of gas mains.

The Midland Counties Public Service Corporation was a consolidation in 1914 of the Coalinga Water & Electric Co., Midland Counties Gas & Electric Co., Paso Robles Light & Water Co., and Russell

Robison Water & Electric Co. The Coalinga Water & Electric Co. had been incorporated on November 29, 1909, under the laws of California, as successor to the Coalinga Light & Power Co.

At June 12, 1930, Midland operated in the western portion of Fresno County, the southern part of Monterey County, the entire County of San Luis Obispo, and the northern part of Santa Barbara County. Principal cities and towns served with electric light and power are San Luis Obispo, Santa Maria, Arroyo Grande, Coalinga, San Miguel, and Paso Robles. It also served Arroyo Grande with domestic water.

All Midland's power was purchased from San Joaquin. The territory served contained a population of 59,600, including 48 communities and embracing an area of approximately 1,842 square miles. The corporation owned and operated an electric distribution system of 1,167 miles of electric transmission and distribution lines.

The Pacific Gas & Electric Co., sometimes hereinafter referred to as Pacific, is a California corporation similarly engaged in the public utility business in California. Prior to June 12, 1930, Pacific and its affiliated companies served a territory embracing 38 counties of northern and central California, with an aggregate area of 61,000 square miles and a population of approximately 2,500,000. The company's system was connected with approximately 1,038,500 customers who were supplied with service through 18,488 miles of electric transmission and distribution lines, and 5,488 miles of gas mains. The principal population served was in the cities of San Francisco, Oakland, and the cities surrounding San Francisco Bay. It also furnished steam heat in the cities of San Francisco and Oakland.

The electric system of Great Western was, in a large part, a duplication of Pacific's electric system, extending through 14 counties in northern and central California, in all of which Pacific was operating and serving many of the same localities. In San Francisco, Oakland, and other cities on San Francisco Bay, over 90 percent of the business served by Great Western was in direct competition with Pacific, with resulting duplication of production, transmission, and distribution systems, district and division offices and warehouses, construction and service crews, salesmen and meter readers, collectors, and general office organization.

The electric system of Great Western was connected to that of San Joaquin by a 103-mile tie line, and the latter system and that of Midland were in large part supplemental to that of Pacific, though mainly not in direct competition. San Joaquin's system extended through eight counties in central California, into three of which Pacific's system also extended. Pacific was serving gas in Fresno, the largest city served with electricity by San Joaquin.

Negotiations looking forward to the acquisition of all the properties of Great Western, San Joaquin, and Midland by Pacific were carried on from the latter part of 1929 up to the agreement dated March 29, 1930. The acquisition of petitioner's stockholdings in Great Western, San Joaquin, and Midland was Pacific's first step in the acquisition of all the properties of these three corporations. The agreement dated March 29, 1930, was between Pacific and the North American Co., owner of 99.8 percent of petitioner's outstanding common stock.

The parties agreed that, subject to the approval of the Railroad Commission of California, the North American Co. would cause petitioner:

* * * to sell, assign and deliver to Pacific the following full-paid shares of stock in the three subsidiary companies, viz.: [schedule of preferred and common stocks owned by petitioner in Great Western, San Joaquin, and Midland hereinabove set forth] together with one share of Preferred Stock of California Electric Generating Company, and will cause Western Power to cancel the floating indebtedness of the three subsidiary companies to it as of January 31, 1930 amounting to $19,180,776.76, in consideration of which Pacific will issue, sell and deliver to Western Power 1,825,000 full-paid shares of the common stock of Pacific, of the par value of $25.00 per share.

Pacific will cause to be paid to Western Power in cash at the time of delivery as hereinafter defined, the excess of the aggregate floating indebtedness of the three subsidiaries to Western Power as of the time of delivery over the sum of $19,180,776.76, being such aggregate floating indebtedness as of January 31, 1930, together with interest at the rate of six per cent (6%) per annum from the respective dates on which the respective amounts of such excess floating indebtedness shall have been incurred to the time of delivery.

The agreement provided specifically for cash adjustment between petitioner and Pacific with respect to the dividends on the stocks exchanged; each party thereto agreed to use its best efforts to obtain a satisfactory decision from the Railroad Commission of California authorizing the carrying out of the agreement in accordance with its terms.

Under date of April 25, 1930, the North American Co. addressed a letter to petitioner's board of directors in reference to the above agreement, as follows:

We hand you herewith a copy of the Agreement dated March 29, 1930, between The North American Company and Pacific Gas and Electric Company.

Pursuant to said Agreement, it is proposed that Western Power Corporation be reorganized in accordance with the following plan:

*Plan of Reorganization*

*of Western Power Corporation*

Western Power Corporation will cancel the floating indebtedness to it of Great Western Power Company of California, San Joaquin Light and Power Corporation and Midland Counties Public Service Corporation as of January

31, 1930, amounting to $19,180,776.76; and Western Power Corporation will then sell, assign, and deliver to Pacific Gas and Electric *all its property* (except 4,904¹²⁄₄₀ths shares of the Common Stock of The North American Company, corporate papers and office records and supplies and the like), consisting of the following shares of stock, viz.: [schedule of stocks owned by petitioner in Great Western, San Joaquin, Midland, and California Electric Generating Company as hereinabove set forth] in exchange for which Pacific Gas and Electric Company will issue and deliver to Western Power Corporation 1,825,000 full-paid shares of common stock of Pacific Gas and Electric Company. [Emphasis supplied.]

The above agreement was approved by petitioner's board of directors on April 25, 1930, and by its stockholders on June 6, 1930. The resolutions of petitioner's directors and stockholders provide that petitioner sell, assign, and deliver to Pacific all of the properties and assets of this corporation, with the exception above noted, in exchange for 1,825,000 shares of common stock of Pacific in accordance with the plan of reorganization.

Under date of May 14, 1930, the Railroad Commission of California authorized Pacific to acquire and hold the above listed stocks; authorized Pacific to issue and deliver to petitioner, as full-paid and for the purpose mentioned in the agreement dated March 29, 1930, 1,825,000 shares of its common stock; refused without prejudice Pacific's request to acquire additional stock and to acquire the properties of Great Western, San Joaquin, Midland, and their respective subsidiaries.

The book value of the assets of Great Western, San Joaquin, and Midland at January 31, 1930, was as follows:

| | |
|---|---|
| Great Western | $134,109,065.19 |
| San Joaquin | 90,650,564.31 |
| Midland | 6,893,221.47 |
| | 231,653,450.97 |

The book value of the assets of Pacific and its subsidiaries at December 31, 1929, was $454,021,922. The book value of the assets of Pacific and its subsidiaries at June 30, 1930, was $659,269,544.25.

The agreement of March 29, 1930, was scheduled to be closed on May 1, 1930, but the closing was delayed to June 12, 1930, at the request of Pacific, owing to delay in obtaining the necessary approval of the California Railroad Commission to this acquisition by Pacific. On June 12, 1930, however, pursuant to the agreement, petitioner canceled the indebtedness of the three companies to it in the amount of $19,180,776.76, transferred all the stock owned by it, except the North American Co. common, to Pacific, and on the same date Pacific issued and delivered to petitioner 1,825,000 shares of Pacific's common stock. The cash received by petitioner on June 12, 1930, immediately prior to such closing, from its three subsidiaries

by way of additional advances after January 31, 1930, was paid over by petitioner to the North American Co. in reduction of petitioner's indebtedness to that company.

At the time of the receipt of the 1,825,000 shares of Pacific's common stock neither the petitioner nor the North American Co. owned any other shares of Pacific's capital stock. Immediately after the closing of said agreement petitioner owned 32.18 percent of Pacific's common stock then outstanding, and 19.77 percent of the total voting stock of Pacific then outstanding.

The capitalization of Pacific immediately prior to and after closing said agreement on June 12, 1930, was as follows:

|  | Authorized | Outstanding prior | Outstanding after |
|---|---|---|---|
| Common | 8,000,000 | 3,847,778.6 | 5,672,778.6 |
| 6% preferred | 5,600,000 | 3,153,718.27¾ | 3,153,718.27¾ |
| 5½% preferred | 1,600,000 | 403,034 | 403,034 |
| 5% preferred | 800,000 | | |
| | 16,000,000 | 7,404,530.87¾ | 9,229,530.87¾ |

The next largest stockholder of Pacific's common stock on June 12, 1930, held 343,200 shares, or 6.04 percent of the total common stock outstanding. The largest stockholder of preferred stock held 20,000 shares, or 56/100 of 1 percent of the total perferred stock outstanding. On that date Pacific had 30,650 holders of 6 percent preferred, 9,952 holders of 5½ percent preferred, and 25,925 holders of common stock.

The amounts of the accounts receivable canceled by the petitioner in pursuance of the agreement were as follows:

Advances to Great Western_____ $15,924,701.60
Advances to San Joaquin_____ 3,256,075.16

Total indebtedness canceled_____ 19,180,776.76

The interest on said canceled indebtedness from January 31, 1930, until May 1, 1930, at 6 percent per annum, amounted to $286,152.83.

The 4,904-12/40 shares of common stock of the North American Co owned by the petitioner on April 25, 1930, were disposed of by it during May 1930, in exchange for common stock of Cleveland Electric Illuminating Co., which latter stock was sold by petitioner on June 10, 1930, and the proceeds paid over to the North American Co. in reduction of petitioner's debt to that company.

After the closing of the agreement of March 29, 1930, whereby Pacific obtained the aforesaid stock of Great Western, San Joaquin, and Midland, those subsidiaries and Pacific continued their corporate existence as before, kept separate books of account, and made separate reports to the California Railroad Commission. However, many economies were effected by eliminating duplication of labor, per-

sonnel, offices, warehouses, equipment, materials and supplies, and other expenses. Connections were established between the electric and steam systems of Pacific and Great Western, and between the electric systems of Pacific and San Joaquin, permitting large interchanges of electric energy and steam, abandonment of certain plants, readjustment of others, and the shutting down of still other plants and substations for long periods of time, all resulting in better and more efficient use of the production, transmission, and distribution facilities of the systems and their operations as one combined business and system. It was estimated by Pacific that by October 1, 1930, savings in annual operating and construction expenses amounted to $1,334,000.

After June 12, 1930, Pacific proceeded to acquire the outstanding minorities of Great Western and San Joaquin. By April 30, 1934, Pacific's holdings in the capital stock of Great Western and San Joaquin were as follows:

GREAT WESTERN

|  | Shares out-standing | Owned by Pacific | Percent |
|---|---|---|---|
| Preferred stock | 129,278 | 127,051 | 98.27 |
| Preferred stock, series A | 48,965 | 48,690 | 99.43 |
| Common stock | 300,000 | 300,000 | 100.00 |

SAN JOAQUIN

|  | Shares out-standing | Owned by Pacific | Percent |
|---|---|---|---|
| Prior preferred | 118,426 | 91,862 | 77.56 |
| Prior preferred, series A | 26,276 | 19,668 | 74.85 |
| Preferred, series A | 64,684 | 60,309 | 93.23 |
| Preferred, series B | 316 | 30 | 9.49 |
| Common | 130,000 | 128,867 | 99.12 |

During 1930, but subsequent to June 12, 1930, Pacific retired or refunded with its own bonds, over $15,000,000 of bonds and notes of Great Western. During 1930 and 1931 Pacific retired $31,441,900 par value of bonds of the subsidiaries of Great Western; and during 1931 and 1932 Pacific exchanged its preferred and common stocks for preferred and common stocks of these subsidiaries, aggregating $30,982,300, making a total of $62,424,200 of stocks and bonds replaced by Pacific's stocks and bonds during 1930, 1931, and 1932.

Prior to June 12, 1930, Great Western, San Joaquin, and Midland were the only companies in California controlled by petitioner or the North American. After that date petitioner, or its stockholders, or both, did not control directly or indirectly Pacific or any companies operating west of the Rocky Mountains other than through the stock ownership in Pacific acquired by the exchange occurring on June 12.

Respondent's increased deficiency is based upon an alleged profit of $68,969,107.89 resulting from the transfer on June 12, 1930. Respondent computed the value of the 1,825,000 shares of Pacific common at $113,834,375, or $62.375 per share, which is the average of the high and low quotations on the New York Stock Exchange on that date. Respondent computed petitioner's total cost of the stock exchanged at $44,865,267.11, which included the book value of the stocks exchanged for Pacific common of $25,398,337.52, the canceled floating indebtedness of $19,180,776.76, plus the interest thereon of $286,152.83 from February 1 to May 1, 1930.

After the agreement of March 29, 1930, was executed between Pacific and the North American Co., petitioner understood that this agreement provided that it should receive interest at the rate of 6 percent on the January 31, 1930, floating indebtedness of Great Western and San Joaquin due to the petitioner up to the date of transfer of the stock of these companies to Pacific, to wit, June 12, 1930, and set up on its books accrued interest due it on that basis. The petitioner prepared the statement for closing with Pacific on that assumption. Pacific objected to petitioner's proposed closing on the ground that the agreement provided that such floating indebtedness should be canceled as of January 31, 1930, and claimed that no interest could accrue thereon after that date, and Pacific refused to recognize that petitioner had any right to accrue interest on such floating indebtedness after January 31, 1930. This controversy was adjusted and settled on the basis of Pacific consenting to petitioner's charging interest on such floating indebtedness from May 1, 1930, to June 12, 1930, because the closing under said agreement had been extended from the former date to the latter date at Pacific's request. The agreement was closed on that basis and the petitioner received no interest on such floating indebtedness from January 31, 1930, to May 1, 1930, but released all claims thereto. However, San Joaquin and Great Western accrued said interest on their books as interest payable, and upon the cancelation of the indebtedness included the same as paid-in surplus on their books of account. A copy of the release and acceptance thereof by Great Western is as follows:

To GREAT WESTERN POWER COMPANY OF CALIFORNIA,
    San Francisco,
        California.

The undersigned, WESTERN POWER CORPORATION (a New York corporation), owns all of your outstanding common stock. At the close of business on January 31, 1930, your floating indebtedness to the undersigned amounted to $15,924,701.60. The interest accrued on that floating indebtedness to June 12, 1930, amounted to $347,689.32, on account of which you have this day paid to the undersigned the sum of $111,472.91, which is the equivalent of interest at the rate of six per cent per annum on said floating indebtedness from May 1, to June 12, 1930.

The undersigned desires to convert the above mentioned floating indebtedness together with the interest accrued thereon at the rate of six per cent per annum to May 1, 1930, into an increase of its investment in your company. For the purpose of effecting this conversion, the undersigned hereby releases all its claims, demands and causes of action against you for or arising out of said floating indebtedness of $15,924,701.60 and the interest accrued thereon to May 1, 1930, amounting to $236,216.41, in consideration of your transferring to paid in surplus on your books of account the amount of floating debt and accrued interest hereby released. This release will become effective immediately upon its acceptance by you upon the terms herein expressed.

IN WITNESS WHEREOF said WESTERN POWER CORPORATION has executed these presents this 12th day of June, 1930.

WESTERN POWER CORPORATION
By [Sgd] J. B. BLACK
*Vice President*

The above release is hereby accepted upon the terms therein expressed.

IN WITNESS WHEREOF GREAT WESTERN POWER COMPANY OF CALIFORNIA has executed these presents this 12th day of June, 1930.

GREAT WESTERN POWER COMPANY OF CALIFORNIA
By [Sgd] A. EMORY WISHON, *Vice President.*

A similar release and acceptance by San Joaquin was entered into except as to amounts. The total amount of interest on the canceled indebtedness for the period January 31, 1930, to May 1, 1930, of the two companies amounted to $286,152.83. The respondent included in the taxable income of the petitioner for the year 1930 the said sum of $286,152.83.

The first issue is whether as a matter of law the transfer on June 12, 1930, was a sale or a statutory reorganization, the facts being undisputed. The transaction is governed by the provisions of section 112 of the Revenue Act of 1928, the pertinent portions of which appear in the margin.[1]

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(a) *General rule.*—Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

(b) *Exchanges solely in kind.*— * * *

* * * * * *

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

(4) SAME—GAIN OF CORPORATION.—No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

* * * * * *

(i) *Definition of reorganization.*—As used in this section and sections 113 and 115—

(1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or * * *

(2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

Since the respondent originally recognized that a reorganization existed and raises the issue by amended answer, therein claiming that petitioner made a taxable sale, it is his burden to establish that, in the premises, there was no reorganization and that such sale occurred.

As indicated in the quoted sections, the general rule is that gain or loss shall be recognized upon the sale or exchange of property. Certain exceptions to the general rule appear in the subdivisions of section 112, and this taxpayer seeks to bring itself within the exceptions where gain or loss is not recognized.

To bring itself within the statutory exceptions the taxpayer must satisfy the requisites of a reorganization found in section 112 (i) (1). These requisites, as to this proceeding, are found in part (A) of the definition, which states that reorganization means a merger or consolidation, including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation.

The petitioner contends that the transaction here involved was a statutory reorganization because of the existence of either or both of two situations: (1) A merger or consolidation including the acquisition by one corporation of substantially all the· properties of another corporation; and (2) a merger or consolidation including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation in exchange for the common stock of the transferee. Petitioner relies upon the decisions of the Supreme Court in *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462; *Helvering* v. *Minnesota Tea Co.*, 296 U. S. 378; *John A. Nelson Co.* v. *Helvering*, 296 U. S. 374; *Helvering* v. *Watts*, 296 U. S. 387; and *G. & K. Manufacturing Co.* v. *Helvering*, 296 U. S. 389.

In the *Pinellas Ice & Cold Storage Co.* case the Court said:

\* \* \* The words within the parenthesis may not be disregarded. They expand the meaning of "merger" or "consolidation" so as to include some things which partake of the nature of a merger or consolidation but are beyond the ordinary and commonly accepted meaning of those words—so as to embrace circumstances difficult to delimit but which in strictness cannot be designated as either merger or consolidation.

One can not read the narrative of facts without coming to the conclusion that when Pacific acquired substantially all of the properties of petitioner it was part of a procedure which, if not strictly a merger or consolidation in law, certainly partook of the nature of a merger or consolidation, thus satisfying the definition announced by the Supreme Court. That the properties acquired constituted "substantially all of the properties" of petitioner is not contested.

In the *Minnesota Tea Co.* case, explaining the rule of the *Pinellas* case, the Supreme Court further observed that the interest acquired by the seller in the affairs of the purchasing company "must be definite and certain; it must represent a substantial part of the thing transferred." We are of the opinion that the stock of Pacific acquired by petitioner in the exchange satisfies this requirement.

Testing the facts of record by the rules laid down by the Supreme Court in the cited cases, we are of the opinion that the transaction by which petitioner exchanged substantially all of its property for stock of Pacific was a reorganization and that respondent's present contention must be denied.

Furthermore, it may well be that the statutory rule, as interpreted by the Supreme Court, has been satisfied with respect to petitioner's second contention. The facts show that petitioner (a stockholder) exchanged "at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock" in three corporations (Great Western, San Joaquin, and Midland) parties to a reorganization, for stock in another corporation (Pacific) a party to the reorganization; that the exchange was made in pursuance of a plan of reorganization; and that the entire transaction falls within the spirit of the statute prohibiting recognition of gain or loss. The petitioner's situation as to this contention is comparable to the position of Watts and the other stockholders in the *Watts* case, *supra*, and the facts seem to bring the case squarely within that decision.

There is one other question to consider before passing this issue, *i. e.*, the cancellation of indebtedness by petitioner before Pacific would accept the capital stock of Great Western and San Joaquin. Assuming, but not deciding, that such cancellation was the equivalent of cash, it would not alter the situation under the Supreme Court's opinions. In the *Minnesota Tea Co.*, *John A. Nelson Co.*, and *G. & K. Manufacturing Co.* cases, *supra*, cash formed a part of the consideration for the exchange but, nevertheless, the Supreme Court held in the first two cases that the transferor acquired a substantial and continuing interest in the affairs of the transferee, and remanded the *G. & K. Manufacturing Co.* case for a determination of whether *substantially all the properties* were acquired by the exchange. These decisions are decisive of this question even if our assumption was an actuality.

The remaining issue is whether the accrual of $286,152.83 interest on the indebtedness of Great Western and San Joaquin to petitioner, amounting to the sum of $19,180,776.76, is income. Respondent's contention that this sum should be included in petitioner's income rests primarily on the accrual entries on petitioner's books of account.

Book entries, however, must give way before the real facts. *Doyle* v. *Mitchell*, 247 U. S. 179, 187. The stipulated facts are that this $286,152.83 was accrued upon the assumption that petitioner was entitled thereto under the agreement of March 29, 1930. That agreement, however, specifically provided for cancellation of the $19,180,-776.76 floating indebtedness as of January 31, 1930, and a closing of the agreement on May 1, 1930. Although there was no provision authorizing petitioner to accrue interest on the indebtedness after the effective date of cancellation, nevertheless, petitioner prepared a statement for closing with Pacific upon the assumption that it was entitled to interest until June 12, 1930, the actual date of closing. Pacific objected to such closing, and claimed that no interest could accrue on a canceled obligation. This controversy was "adjusted and settled" by Pacific consenting to petitioner's charging interest from May 1 to June 12, 1930, since the closing had been extended at Pacific's request, but denying petitioner's claim to interest from January 31 to May 1, 1930. Petitioner, therefore, received no interest for the period January 31 to May 1, 1930, which was exactly in accord with the terms of the agreement of March 29, 1930. Petitioner's letter to its subsidiaries regarding the inclusion of this accrued interest in their paid-in surplus can not alter the fact that the accruals were erroneous. Obviously, no income was realized by petitioner from these accruals and, therefore, upon this issue, we hold against the respondent. *Stern-Slegman-Prins Co.* v. *Commissioner*, 79 Fed. (2d) 289, affirming an unpublished memorandum opinion of the Board.

Our decision on the first issue makes it unnecessary to go into the alternative issue relating to the value of a block of 1,825,000 shares of Pacific's common stock on June 12, 1930, and all facts of record with respect thereto have been omitted.

Reviewed by the Board.

*Decision will be entered under Rule 50.*