HENRY HUDSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54774. Promulgated May 25, 1939.

*George E. H. Goodner, Esq.,* and *D. F. Prince, Esq.,* for the petitioner.

*L. W. Creason, Esq.,* and *Owen W. Swecker, Esq.,* for the respondent.

1084

OPINION.

KERN: The respondent in determining the deficiencies herein treated the exchange of stock in 1922 and the exchange of Sylphon Co. stock for Reynolds Co. stock in 1928 as nontaxable exchanges. He also treated the transactions completed in 1927 between the stockholders of the Fulton Co., the Sylphon Co. and Barney & Co. as a statutory reorganization, the gain realized therefrom being recognizable under section 203 (d) (1) of the Revenue Act of 1926 "in an amount not in excess of the sum of such money" received in the exchange. In his answer to the second amended petition the respondent affirmatively alleges that the transaction whereby the petitioner received cash and Sylphon Co. stock for his Fulton Co. stock was a sale consummated in accordance with the stockholders' agreement with Barney & Co. and the escrow agreement, and that therefore all the gain is recognizable. He contends that the steps taken in carrying out the plan were inseparable and constituted the consummation of one indivisible contract, the underlying purpose and result of which was the sale by the stockholders of the Fulton Co. of their stock for $5,000,000, as originally contemplated by the

option given the Reynolds Metal Co., namely, that the earlier stock of the Fulton Co. was purchased by Barney & Co. as agent or manager of a syndicate, of which it was a member, for cash and shares of stock of the Sylphon Co., and that the entire amount of the gain is recognizable under the general rule set forth in section 203 (a) of the Revenue Act of 1926.[2] He claims an increased deficiency.

The petitioner contends that there were two separate transactions, i. e., (1) an exchange by the stockholders of the Fulton Co. of all their stock for 15,000 shares preferred and 120,000 shares common stock of the Sylphon Co., constituting a nontaxable reorganization under sections 203 (b) (2), (h) (1) (A), and (h) (2) of the Revenue Act of 1926,[3] and (2) a sale by the former stockholders of the Fulton Co. of 100,000 shares of the common stock of the Sylphon Co. to Barney & Co. for $2,790,000, the amount of the gain realized or the loss sustained on such sale depending upon the determination of the March 1, 1913, value of the Fulton Co. stock.

Whether the various steps taken to carry out the agreement herein constitute one transaction or two separate and distinct transactions is a question of fact. *Commissioner* v. *Harris*, 92 Fed. (2d) 374; *Helvering* v. *Ward*, 79 Fed. (2d) 381.

It is our opinion that what was done herein must be regarded for income tax purposes as a single transaction and that as such it constituted a reorganization under clause A of section 203 (h) (1) of the Revenue Act of 1926.

The Fulton Co. and Sylphon Co. were each a "party to a reorganization" under section 203 (h) (2) of the 1926 Act, which provides that such term includes "both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock * * * of another corporation." The Sylphon Co. acquired all of the outstanding stock of the Fulton Co. In *Groman* v. *Commissioner*, 302 U. S. 82, the United States Supreme Court, referring to section 112 (i) (2) of the 1928 Act, corresponding to section

---

[2] Sec. 203. (a) Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 202, shall be recognized * * *.

[3] Sec. 203(b)(2). No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

* * * * * * *

(h) As used in this section and sections 201 and 204—

(1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation * * *.

(2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

203 (h) (2) of the 1926 Act, stated that that section "is not a definition but rather is intended to enlarge the connotation of the term 'a party to a reorganization' to embrace corporations whose relation to the transaction would not in common usage be so denominated or as to whose status doubt might otherwise arise." Barney & Co. was not a party to the reorganization effected. That a party not a party to the reorganization effected was instrumental in bringing about such reorganization by furnishing the cash is not material under the circumstances herein. In *Groman* v. *Commissioner, supra,* the Glidden Co. entered into an agreement with the stockholders of the Metals Refining Co., pursuant to which the assets of the latter were transferred to a newly organized company, and the stockholders of the Metals Refining Co. received in exchange for their stock shares of preferred stock of the Glidden Co., shares of preferred stock of the new company, and cash, which cash had been paid by the Glidden Co. to the new company for all of its common stock. In that case the United States Supreme Court stated:

The exchange was between Indiana's [Metals Refining Co.] shareholders and Ohio [new company]. Do the facts that Glidden contracted for the exchange and made it possible by subscribing and paying for Ohio's common stock in cash, so that Ohio could consummate the exchange, render Glidden a party to the reorganization? No more so than if a banking corporation had made the agreement with Indiana's shareholders and had organized the new corporation, and, by subscription to its stock and payment therefor in money and the banking company's stock put the new company in position to complete the exchange. Not every corporate broker, promoter, or agent which enters into a written agreement, effectuating a reorganization, as defined in the Revenue Act, thereby becomes a party to the reorganization.

It was held therein that a reorganization was effected under section 112(i) (1) (A) of the Revenue Act of 1928 by the transfer of all the stock of the Metals Refining Co. to the new company. The Court further held that, since the Glidden Co. was not a party to the reorganization, the gain realized by the taxpayer, a stockholder of the Metals Refining Co., on the reorganization was taxable under section 112(b) (5), (c) of the 1928 Act to the extent of the cash and the fair market value of the Glidden Co. stock received by him.

To constitute a reorganization within clause A, the dissolution of the Fulton Co. was not necessary. *Helvering* v. *Minnesota Tea Co.,* 296 U. S. 378; *G. & K. Manufacturing Co.* v. *Helvering,* 296 U. S. 389. A large part of the consideration may be cash. *G. & K. Manufacturing Co.* v. *Helvering, supra; Helvering* v. *Minnesota Tea Co., supra; Nelson Co.* v. *Helvering,* 296 U. S. 374; and *Western Power Corporation,* 34 B. T. A. 618; affd., 94 Fed. (2d) 563. Participation in the management, and the acquisition of a controlling interest, in the acquiring corporation is not requisite under clause A. *Nelson*

*Co.* v. *Helvering, supra.* The interest of the stockholders of the Fulton Co. acquired in the Sylphon Co. was definite and material and represented a substantial part of the value of the thing transferred. See *Nelson Co.* v. *Helvering, supra,* wherein the stockholders of a corporation transferred all the corporation's assets except cash in exchange for cash and preferred stock of the acquiring corporation. The United States Supreme Court therein held that the "owner of preferred stock is not without substantial interest in the affairs of the issuing corporation, although denied voting rights." The stockholders of the Fulton Co. were entitled to receive all of the preferred stock of the Sylphon Co. and in addition 20,000 shares of its common stock. A substantial change in the relationship of the transferor to the assets conveyed is not inhibited by the section 203(b)(2) applicable herein. *Helvering* v. *Minnesota Tea Co., supra;* see also *Helvering* v. *Watts,* 296 U. S. 387; *Commissioner* v. *Freund,* 98 Fed. (2d) 201; *Commissioner* v. *Kitselman,* 89 Fed. (2d) 458. It is immaterial that one stockholder having a 7/75 interest in the Fulton Co. received cash only. Since section 203 (b)(2) is applicable, we need not regard section 203(b)(4), which allows tax deferment only if the existing proportion of interest is substantially preserved. There was a substantial continuity of interest, since all the remaining stockholders of the Fulton Co. continued to be represented in the Sylphon Co. either by common or preferred stock or both.

The respondent argues that the original plan of the stockholders of the Fulton Co. was to sell all their stock for $5,000,000, to which end the option of November 6, 1926, acquired by Barney & Co. was executed, and that the intent of the Barney & Co. contract was only to provide in detail the manner in which the consideration of $5,000,-000 for the entire stock of the Fulton Co. viz., $2,690,000, plus $100,000 in cash and $2,210,000 in common and preferred stock of the Sylphon Co., might be paid. It does not clearly appear who the respondent claims to be the purchaser of the Fulton Co. stock. We are not concerned here with the original option given to the Reynolds Co., which is not in evidence but apparently gave that company an option to acquire all of the outstanding stock of the Fulton Co. for $5,000,-000, whether in cash or stock is not disclosed. It is apparent that the plan of reorganization of the Fulton Co., as disclosed by the Barney & Co. agreement and the escrow agreement, did not contemplate a reorganization involving an exchange of stock of the Fulton Co. for stock of the Sylphon Co. only, and a subsequent sale of 100,000 shares of the common stock of Sylphon Co. to Barney & Co., as contended by the petitioner, but that it contemplated at the outset the acquisition of cash through Barney & Co. by means of a sale of the 100,000 shares of common stock of the Sylphon Co. so that the stock-

holders of the Fulton Co. would receive stock of the Sylphon Co. and cash in exchange for their holdings in the Fulton Co. The 100,000 shares of Sylphon Co. stock were to be issued, as provided in the escrow agreement, to one John A. Hurley, who was not a stockholder, and the escrow agent was directed to deliver the same to Barney & Co. or as it might direct, upon the payment by it of the additional $2,690,000. In the distribution of the Sylphon Co. stock and cash directed to be made in the escrow agreement the transaction was treated as an entirety. The Barney & Co. agreement provided that if that company should fail to pay the additional sum of $2,690,000 on or before January 20, 1927, the escrow agent on demand should return to the stockholders of the Fulton Co. their respective number of shares deposited with it and that all obligations under the agreement should cease. The escrow agreement provides that the escrow agent should return promptly to the stockholders of Fulton Co. their respective shares deposited with it in the event Barney & Co. should fail to make the additional payment prior to the close of business on January 20, 1927, and all the Sylphon Co. stock was to be delivered to Fulton. Thus it appears that the delivery of the Fulton Co. stock to the Sylphon Co., which was necessary to effect a reorganization at all, was dependent upon the payment of the cash by Barney & Co.

On brief the petitioner calls attention to the language of the Barney & Co. agreement, viz., "After obtaining the stock of the Fulton Sylphon Company, we agree to sell you and you agree to buy 100,000 shares" etc., as showing a sale of such shares to Barney & Co. Whether this was a sale or a part of the plan of reorganization must be tested by the entire agreement and "by what in fact was done rather than by the mere form of words used in the writings employed." *Helvering* v. *Tex-Penn Oil Co.*, 300 U. S. 481.

The case of *Commissioner* v. *Harris*, *supra*, relied upon by the petitioner, is distinguishable upon the facts. In that case the acquiring company agreed to exchange six shares of its stock for one share of stock of another company and also agreed to procure the agreement of a banking house to purchase one-half of its own stock given in exchange. It was held therein that the sale was not to be identified with the exchange of stock for stock and that there were two transactions, one of which was a reorganization within clause (A) of paragraph (1) of subdivision (h) of section 203 of the Revenue Act of 1926. *Peir* v. *Commissioner*, 96 Fed. (2d) 642, is likewise distinguishable upon the facts. The facts therein clearly disclose two separate and distinct transactions, i. e., (1) a reorganization effected by the exchange of the assets of Western Oxygen for 16,342 shares of Air Reduction stock and the assumption of the liabilities of the

former by the latter company, followed by (2) a sale of 1,811 shares of Air Reduction stock by Western Oxygen to obtain funds with which to retire its own preferred stock. Thereafter it distributed the remaining Air Reduction stock, except 342 shares which were transferred to its president as compensation, pro rata to its common stockholders and dissolved. In both cases the reorganization was complete and effective without the sale. Herein the reorganization was dependent upon the sale of 100,000 shares of Sylphon Co. stock through Barney & Co., and the gain resulting from the exchange is taxable pursuant to section 203 (d) (1) of the Act of 1926 to the extent of the cash received.

That section provides that if an exchange would be within the provisions of paragraph (2) of subdivision (b), "if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of * * * money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money * * *." In order to determine the gain, if any, recognizable under section 203 (d) (1), *supra*, and applicable herein, it is necessary to determine the basis of the Fulton Co. stock. Under section 204 (a) (6) and (b) of the 1926 Act, the basis for determining the gain, if any, is the cost of the original 50 shares of Fulton Co. stock acquired by petitioner prior to 1913, or the fair market value as of March 1, 1913, whichever is greater.

The petitioner contends that the fair market value of the petitioner's 50 shares of Fulton Co. stock as of March 1, 1913, was not less than $329,000, or $6,580 a share. The respondent determined a value of $27,841.66, or $556.83321 per share. The respondent determined that the assets of the Fulton Co. as of March 1, 1913, had a value as follows: Tangible assets, $156,833.21, and intangible assets, $400,000, or a total of $556,833.21. There is no controversy as to the fair market value of the tangible property owned by the Fulton Co. as of March 1, 1913. The parties differ as to the March 1, 1913, value of the intangible property owned by the Fulton Co., and in particular as to the value of the patents owned by the Fulton Co.

On behalf of the petitioner, Fulton testified that in his opinion the patents owned by the Fulton Co. had a value as of March 1, 1913, of $6,580,000. This amount represents 33⅓ percent of estimated prospective earnings or net profits from 1913 to 1927, or a period of 14 years, in the amount of $19,740,000. This amount was based on prospective estimated sale of 1,015,000 units per year and net profits of $1,410,000 per year. In examining the evidence submitted it appears that in 1912 and 1913 only 130,050 and 209,272 units, respectively, were sold, and that from 1913 to 1927 the unit sales per year

were far below the estimate of Fulton except 1925 and 1926, in which the unit sales amounted to 1,086,445 and 1,538,765 respectively. It also appears that the average annual sales from 1913 to 1927, omitting 1922 however, amounted only to 599,072 units, or over 400,000 less than the estimate of Fulton. In comparing the annual net profit of $1,410,000 estimated by Fulton with the actual net income of the company, it appears that the net income of the company never reached Fulton's estimate, even in the best years of 1925 and 1926. As compared with estimated annual net profits of $1,410,000, the company in fact had average net profits from 1913 to 1927 over a period of 14 years of approximately $219,000. The petitioner in his reply brief argues that there is nothing in the record to show what relation "unit profits" as estimated by Fulton bore to "net income" and that to assume that they are one and the same thing is erroneous. Eliminating the comparison between "net profits" as estimated by Fulton and the "net income" as reflected by the books of account of the company, there still remain the discrepancies between Fulton's estimated unit sales and the actual unit sales as shown by the records of the company. Petitioner further argues that Fulton's estimate was based on facts as of March 1, 1913, augmented by his judgment and opinion, and that what happened afterward is immaterial. In *Sinclair Refining Co.* v. *Jenkins Petroleum Process Co.*, 289 U. S. 689, the United States Supreme Court stated:

* * * A patent is a thing unique. There can be no contemporaneous sales to express the market value of an invention that derives from its novelty its patentable quality. * * * The law will make the best appraisal that it can, summoning to its service whatever aids it can command. * * * At times the only evidence available may be that supplied by testimony of experts as to the state of the art, the character of the improvement, and the probable increase of efficiency or saving of expense. * * * This will generally be the case if the trial follows quickly after the issue of the patent. But a different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within.

See also *Nachod & United States Signal Co.* v. *Helvering*, 74 Fed. (2d) 164; *Miller Industries Co.* v. *Commissioner*, 61 Fed. (2d) 412; *Simmons Co.* v. *Commissioner*, 33 Fed. (2d) 75. It is clear that the expectations of Fulton of unit sales, upon which he based his estimated net profits and value of the patents, are not justified by the subsequent sales of the company.

On behalf of the respondent a patent lawyer, engaged in the practice of patent law since 1920, testified that in his opinion the patents here involved had a value as of March 1, 1913, of $113,312.11. He arrived at this value by taking 5 percent of $2,266,242.30, which amount represents gross sales of the Fulton Co. from 1905 to March 1,

1913, a period of 8⅙ years, in the amount of $755,414.10, plus twice that amount, or $1,510,828.20, representing in his opinion gross sales reasonably to be expected for the next 8⅙ years. The gross sales of the Fulton Co. from March 1, 1913, to the end of 1918 were in excess of $5,000,000. In arriving at this valuation he took into consideration among other things a large number of patents which in his opinion constituted the prior art, the possibility of competition under such patents, and the possibility that the Fulton patents might be declared invalid within a period of five to 8⅙ years because of such prior art, and any monopoly inherent therein disappear. He testified that in his opinion in view of the prior art the Fulton patents did not create a monopoly or establish a new industry. He further testified that, assuming there were no competitive patents in existence, the value of the Fulton patents as of March 1, 1913, would, in his opinion, be approximately 10 percent of his estimated gross sales of $2,266,242.30. The respondent introduced numerous patents as illustrative of the prior art and its scope, as to which this witness testified at great length. It was the opinion of this witness that any competitor coming into this field could make the bellows under the Blair machine, Patent No. 17,356 of 1889, or the Koffler machine, Patent No. 700,662 of May 20, 1902, without coming within the scope of the claims of the Fulton patent, No. 971,838, and that therefore the Fulton process patent could not be exclusive. In *Fulton Co.* v. *Bishop & Babcock Co.*, 17 Fed. (2d) 999, (February 13, 1925) ; affd., 17 Fed. (2d) 1006, the court, after considering the prior art, including the Blair patent, stated as to the Fulton patent, No. 971,838, as follows:

* * * Fulton's patent is entitled to rank as a pioneer or primary patent and to have the range of equivalents accorded to patents of that class. He produced an article of commerce hitherto unknown. The process by which he did so had never before been successfully practiced, although its desirability was pointed out by Webster in 1856. His labors may be said, not only to have answered the problem, but to have ended the search. He has founded an art. * * *

In that case the Bishop & Babcock Co. claimed upon application for rehearing that it was operating a machine strictly in accordance with the disclosures of the Blair patent, but the court held that it was not, but had "merely constructed new rolls, different in substantial respects from, the rolls of the Blair patent, and installed them on spindles of its infringing machine in lieu of the Fulton type of rolls." *Bishop & Babcock Manufacturing Co.* v. *Fulton Co.*, 37 Fed. (2d) 293. In *Sturtevant Co.* v. *United States*, 18 Fed. Supp. 28; affd., 99 Fed. (2d) 72, which involved the determination of the value of certain patents and patent rights as of March 1, 1913, the court received a great number of patents in evidence for the purpose of showing the

state of the art in 1913. As to such evidence the court stated as follows:

* * * The record is barren of any evidence tending to show what impression these earlier patents made upon the art, or whether they met with any commercial success. Assuming that these patents were properly admitted, they can be given no weight in this case in the absence of evidence showing that they had an effect upon the business which the petitioner was able to carry on by virtue of its patents.

There is no evidence herein showing what effect, if any, the prior art had upon the business of the Fulton Co. The evidence, however, discloses that, whatever the situation may have been in 1913 and prior thereto, and although there were on the market other devices performing functions similar to those performed by many of the Fulton products, the Fulton Co. was able nevertheless to, and did, establish itself and increased its unit sales from 356 in 1905 to 209,272 in 1913 and its gross sales from $2,115.60 in 1905 to $359,105.84 in 1913.

An engineer of the Engineering Appraisal Section of the Bureau of Internal Revenue since 1920 also testified as to the value of the Fulton patents. In his opinion the value of such patents as of March 1, 1913, was $400,000, which is the value used by the respondent in determining the deficiencies herein. This witness determined such value as follows: He assumed an average profit until October 1927 equal to the profits of 1913 in the amount of $82,363.32. He deducted therefrom the profits due to tangibles (8 percent of $156,833.21), which left a profit of $69,816.67 attributable to the patents or intangibles over a period of 15 years. By the use of Hoskold's Formula at 12 percent profit and 4 percent sinking fund ($69,816.67 x .392293 equals $410,828.86) he arrived at the value of $400,000, which he recommended in a report under date of November 5, 1930, in connection with another matter involving the value of the stock of the Fulton Co. as of March 1, 1913, in which the petitioner herein was not involved. The witness testified upon cross-examination that at the time he determined such value "he needed any amount of information and did not get it" and that he particularly wanted some data as to what the conditions were on March 1, 1913; likewise, as to what happened in 1925, 1926, and 1927. Another witness, an investment counsel, statistician, and economist, also testified in behalf of the respondent. In his opinion the value of the Fulton Co. stock as of March 1, 1913, did not exceed $500,000. In reaching such opinion of value he did not evaluate the patents. He testified that he did not do so as he made no claim of ability to value patents. Section 204 (b), *supra*, provides that "In determining the fair market value of stock in a corporation as of March 1, 1913, due regard

shall be given to the fair market value of the assets of the corporation as of that date."

The respondent also submitted capital stock returns of the Fulton Co. for the years 1916 to 1926, inclusive, excepting 1920, signed by Fulton, for whatever they might be worth as a part of the cross-examination of Fulton in connection with his testimony pertaining to the value of the patents. In *Nachod & United States Signal Co. v. Helvering, supra*, the court stated that "capital stock returns are of no probative force in an inquiry as to the value of the patents." To the same effect is *Sturtevant Co. v. United States, supra*.

The valuation of patents is a question of fact to be determined on all the evidence. *Sturtevant Co. v. Commissioner*, 75 Fed. (2d) 316. In our determination of the March 1, 1913, value of the Fulton Co. stock, we have considered all the evidence, and in particular all the facts in existence or within reasonable expectation on March 1, 1913, and as *fairly corroborated by subsequent events*. We have not overlooked the written report under date of January 25, 1926, made by Fulton to the directors of the company in which he attributes the outstanding results of 1925 to the unusual activity in general business, the marked increase of almost 200 percent in the automobile and special engineering sales, the winning of two important patent suits in the lower courts, and the most able business and factory management of its then general manager and his organization. While this report discloses that the management was a "highly potent factor" in producing such favorable results, the report also discloses that prior to April 1922, when a change in management took place, the factory organization, sales organization, and management of the company were such as seriously to hinder and impede the efficient operation of the company's business and to affect unfavorably its trade relations. This may be an explanation in part of the low earnings of the company during 1918 and 1921 inclusive, as shown in our findings of fact. In that connection, it is to be noted that while the gross sales in 1918 and 1920 were substantially higher in amount than in any previous year, the net income was lower than in 1913. It has been stipulated that the tangible assets of the Fulton Co. had a value on March 1, 1913, of $156,833.21. After giving due consideration to all of the evidence, we have reached the conclusion and have so found that the stock of the Fulton Co. had a value of $706,833.21 as of March 1, 1913.

The next questions to be considered are whether the respondent erred in disallowing a loss of $309 claimed by the petitioner on the sale of 100 shares of Sylphon Co. stock in 1928 and in applying the first in, first out rule in determining the gain on all sales in 1928. The petitioner purchased 300 shares of the common stock of Sylphon

Co. in November 1927 at $42.15 a share through Barney & Co., the stock remaining in the possession of Barney & Co. In August 1928 that company, upon the direction of the petitioner, sold 100 of the 300 shares for $3,906. This is uncontradicted. The shares were purchased at the same time in a lot of 300 shares at the same price per share and remained in the possession of Barney & Co. The result would have been the same whatever hundred of these 300 shares had been sold. In our opinion, the designation of a definite number of shares in a particular lot is sufficient to overcome the first in, first out rule. Certificates of stock are not the only possible means of identifying stock. *Helvering* v. *Rankin*, 295 U. S. 123; *Miller* v. *Commissioner*, 80 Fed. (2d) 219. Therefore, on this sale the petitioner sustained a loss of $309 (one-third of $12,645 less $3,906). Since the 100 shares were held less than two years, the loss sustained must be treated as an ordinary loss in the computation of petitioners' tax liability for 1928 under Rule 50.

In November 1928 the petitioner sold through Barney & Co. 750 shares of the common stock of the Reynolds Co. at $34.81 a share, and 550 shares of the same stock through Bauer, Pogue, Pond & Vivian for $39.81 a share. The petitioner claims that the 750 shares of Reynolds Co. stock sold were a part of the shares of Reynolds Co. stock received in exchange for the 200 shares of Sylphon Co. stock held by Barney & Co. and a part of the lot of 300 shares purchased in November 1927 at $42.15 a share, and for the 1,300 shares of Sylphon Co. stock purchased in July 1928 at $37.65 a share, and that one-half of the purchase price of the Sylphon Co. stock is the basis to be used in determining gain on the sale of the 750 shares of common stock of the Reynolds Co. sold in 1928, and that such gain should be treated as ordinary gain. As to the 550 shares sold through Bauer, Pogue, Pond & Vivian, the petitioner testified that he "was inclined to think [they] were certificates obtained in exchange for original stock through the various transmutations."

The respondent on brief states that he determined the bases of both the 100 shares of Sylphon Co. stock and the 1,300 shares of Reynolds Co. stock sold by petitioner under the first in, first out rule because there was no identification of the particular shares sold. In computing petitioner's tax liability, he treated the gain determined by him as capital gain.

In September 1928, after the sale of the 100 shares of common stock of the Sylphon Co., the petitioner exchanged all of his Sylphon Co. stock for Reynolds Co. stock in a nontaxable exchange. The Board and the courts have held that upon receipt of stock of a different corporation in a reorganization the first in, first out rule is not applicable, but that the cost or other basis of

the stock exchanged is the basis of the stock received and that such basis must be allocated equally to all shares received. *Christian W. Von Gunten*, 28 B. T. A. 702; affd., 76 Fed. (2d) 670; *Olive Hume Oliver*, 30 B. T. A. 1381; affd., 78 Fed. (2d) 561; *P. L. Wheeler*, 32 B. T. A. 917; *Lewis K. Walker*, 35 B. T. A. 640; *Jacob Epstein*, 36 B. T. A. 109; *Harry M. Runkle*, 39 B. T. A. 458; *Helvering* v. *Stifel*, 75 Fed. (2d) 583. Under the rule of such cases the basis for the stock received is the total of the fair market value of the Fulton Co. stock as determined by us and the purchase price of the additional stock purchased by him, less the cost of the 100 shares of common stock of the Sylphon Co. sold prior to the exchange of Sylphon Co. stock for Reynolds Co. stock. Since the petitioner received both common and preferred stock of the Reynolds Co. in exchange, however, the basis should not be allocated equally to all shares, but should be allocated to the common and preferred stock in the proportion that the fair market value of each class bears to the total fair market value of both classes. *Frances Elliott Clark*, 28 B. T. A. 1225; affd., 77 Fed. (2d) 89; *Philip D. C. Ball*, 27 B. T. A. 388; affd., 69 Fed. (2d) 439; *Clifford Hemphill*, 25 B. T. A. 1351.

We must now determine whether the gain or loss realized or sustained by the petitioner on the respective sales of the 750 shares and 550 shares of common stock of the Reynolds Co. is ordinary or capital gain or loss.

Section 101 (c) (8) (A) of the Revenue Act of 1928 provides in substance that where property is acquired on an exchange and the property acquired takes the basis of the property exchanged for the purpose of determining gain or loss, then the period of holding the property exchanged shall be added to the period of holding of the property acquired in determining the period for which the taxpayer held the property acquired. The Commissioner has not yet published a regulation under this section dealing with the question of the period of holding stock under circumstances such as are here present, although the advisability of such a regulation was suggested by us in both *Epstein's* case and *Runkle's* case. In the briefs filed in the instant proceeding both parties, in considering the question of the time of holding the stock, assume that the question here involved has to do only with the identification of the dates of acquisition by petitioner of the Sylphon Co. stock exchanged for the Reynolds Co. stock. It is, therefore, apparent that both have assumed that a method analogous to the first in, first out rule should be applied to the solution of this problem. In the absence of a regulation of the Commissioner on this question containing a better method for its solution we shall, for the purposes of this case, adopt the method apparently followed by the parties.

The evidence shows that Barney & Co. held 200 shares of Sylphon Co. stock which had been purchased in November 1927, and that the bank in Chicago held 1,300 shares as collateral which had been purchased in July 1928. As a result of the exchange of Sylphon Co. stock for Reynolds Co. stock, Barney & Co. received 100 shares of common stock of the Reynolds Co., together with 100 shares of its preferred stock, and the bank received, in addition to 650 shares of preferred stock, 650 shares of the common stock of the Reynolds Co., 565 shares of which it forwarded to the National Park Bank of New York as collateral to a loan made by the petitioner. These 565 shares were forwarded by the New York bank to Barney & Co. Hence, of the 750 shares of Reynolds Co. common stock sold by Barney & Co., 100 shares are clearly traceable to the 200 shares of Sylphon Co. stock purchased in November 1927, and 565 shares thereof are clearly traceable to the 1,300 shares purchased in July 1928. It is our opinion, therefore, that the gain or loss on 665 shares of the 750 shares sold by Barney & Co. should be treated as an ordinary gain or loss. However, the evidence fails to identify the remaining 85 of the 750 shares sold by Barney & Co. and the 550 shares of stock sold through Bauer, Pogue, Pond & Vivian. Hence, the gain or loss computed on these shares must be treated as capital gain or loss in the computation of petitioner's tax liability.

The petitioner contends that his tax liability for 1927 and 1928 was settled and compromised and that the respondent is therefore estopped, under the circumstances herein, to claim any additional taxes for such years. The evidence in the record on this question fails to disclose that there was a compromise under the provisions of either section 3229 or section 3469 of the Revised Statutes. Under the former the Commissioner is authorized to compromise any civil or criminal case arising under the internal revenue laws "with the advice and consent" of the Secretary of the Treasury, and under the latter, the Secretary of the Treasury is authorized to compromise any claims in favor of the United States upon the report and recommendation of certain officials designated in the statute. What was said by the Court in *Botany Worsted Mills* v. *United States*, 278 U. S. 282, is equally applicable herein:

* * * Here the attempted settlement was made by subordinate officials in the Bureau of Internal Revenue. And although it may have been ratified by the Commissioner in making the additional assessment based thereon, it does not appear that it was assented to by the Secretary, or that the opinion of the Solicitor was filed in the Commissioner's office. * * * When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.

See also, *Hughson* v. *United States*, 59 Fed. (2d) 17; certiorari denied, 287 U. S. 630; and *Hanby* v. *Commissioner*, 67 Fed. (2d) 125.

*Decision will be entered under Rule 50.*