Estate of Arthur J. Brandt, Deceased, Glenn C. Gillespie and Lucile M. Brandt, Executors, et al. [1] v. Commissioner. Estate of Arthur J. Brandt v. Commissioner
Docket Nos. 17440, 19800, 19801, 19802, 19803, 19804, and 19805.
United States Tax Court
1949 Tax Ct. Memo LEXIS 89; 8 T.C.M. (CCH) 820; T.C.M. (RIA) 49226; August 31, 1949
R. M. O'Hara, Esq., Harry A. Smith, C.P.A., 1126 Dime Bldg., Detroit 26, Mich., and William F. Robinson, Esq., for the petitioners. Wesley A. Dierberger, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioners challenge respondent's determination of a deficiency in estate tax in the amount of $74,237.42. This deficiency results in part from respondent's action in increasing the fair market value of property in the estate by the amount of $96,544.45; and in including in the estate the cash balances in three bank accounts, and the value of a one-fourth interest in a partnership transferred by decedent to his two sons. Other adjustments are not contested or are now conceded by petitioners. Personal liability as fiduciaries is asserted against petitioners Lucile M. Brandt and Glenn C. Gillespie in Docket Nos. 19800 and 19801, respectively. Transferee liability is asserted against petitioners Lucile M. Brandt, Arthur J. Brandt, Jr., Richard M. Brandt, and James A. Brandt, in Docket Nos. 19802, 19803, 19804, and 19805, respectively. Petitioner Lucile M. Brandt, Transferee, admits liability *91 as transferee under section 900, Internal Revenue Code, to the extent of any deficiency found against the estate in these proceedings. The proceedings were consolidated. The parties have filed a stipulation of facts. Findings of Fact The stipulated facts are hereby found accordingly. Petitioners Glenn C. Gillespie and Lucile M. Brandt, hereinafter called Gillespie and Lucile, as executors of the estate of the decedent Arthur J. Brandt, filed a Federal estate tax return with the Collector of Internal Revenue for the district of Michigan. Facts Relating to Transfers to Decedent's Sons: Decedent died on May 30, 1944, at the age of 55 years and 11 months. He was survived by his wife, Lucile, whom he married in 1913, and his three sons, petitioners Arthur, Jr., Richard, and James. Decedent, a graduate engineer, worked for various companies until the year 1928 when he established his own business as a consulting engineer. On January 3, 1938, he formed a partnership with Gillespie and L. F. Jubenville for continuation of the business. Gillespie was a lawyer and former State judge, and Jubenville was an accountant. Interests in the partnership, operating *92 as A. J. Brandt Company, were as follows: Partner
Interest
Decedent
50%
Gillespie
25%
Jubenville
25% From the beginning, decedent intended to bring his three sons into the partnership when they became graduate engineers and wished to become members, provided they had attained an age of 21 years. In the year 1940 Arthur was a senior in engineering college and had made up his mind to work with his father rather than seek other employment after graduation. Upon receiving his degree in mechanical engineering in August, 1940, Arthur began working in the engineering department of National Tool Company, Cleveland, Ohio, of which decedent was president. In December, 1940, Arthur was transferred directly to the partnership, and worked there at engineering duties until September 10, 1941, when he entered the Army. Richard graduated from college with a degree in mechanical engineering in December, 1943, and upon graduation entered the Navy. In the spring of 1942 decedent went to San Diego, California, as a representative of the Office of Production Management of the Federal government to make recommendations and assist in the production of aircraft by the Consolidated *93 Vultee Aircraft Corporation. In a letter to Arthur, dated July 31, 1942, he wrote: "Please don't worry about my dropping my own business in Detroit for any job here or elsewhere. I spent too many years building up that business to throw it overboard, and I think the record we have made is one of the most enviable in the country. I still am in hopes that when the war is over that you and Dick and Jimmy can become a part of it and carry it on. The work which you are now doing should help you a lot in the future, especially with the type of work that I have been specializing in there for so many years." In a letter to Jubenville and Gillespie, dated December 3, 1943, decedent stated as follows: "As you know, it has been my hope ever since founding this business, that it could be built up to the point where, when my boys became of age, I could make it possible for them to acquire an interest in it so that they could eventually carry it on and have the business for themselves. "If agreeable to you I should like to have this accomplished to become effective as of January 1, 1944, even though the formal execution of the necessary papers may be delayed until after that date. I know *94 that it is necessary to do and carry out certain legal matters as well as having the books of the partnership adjusted to give proper recognition to each and every one connected with the partnership. "It is my wish that half of my present interest be made available equally between Arthur J. Brandt, Jr. and Richard M. Brandt. It is my intention when Jimmy becomes of age that arrangements be made at that time so that he shall acquire a similar interest. "For the purpose of carrying out my intention in this matter I wish at the earliest possible date that you would arrange for a supplemental partnership agreement and preparation of the necessary papers to be filed in the County Clerk's Office showing the new members of the partnership." In a letter to Arthur, dated January 3, 1944, decedent wrote: "I am enclosing copy of a letter I am think of writing to Mr. Jubenville and Judge Gillespie. In effect this is what I have in mind - (1) to begin transferring my interest in A. J. Brandt & Co. to you boys providing you want it. Very often I think fathers make the mistake of going blithely along building up a business - on the supposition that their sons will want that business and want *95 to carry it along. So before I go ahead and do something like that, I thought it best to find out if you and Dick do want the business or should I forget that part of it. "(2) If you do want an interest - here is what I would like to do. To save income tax and gift tax I have been advised by Mr. Jubenville and Mr. Putnam that it would be best to sell you a 1/8 interest 12 1/2% of the entire company for $6250. You can either borrow directly from the Detroit Bank - mother would be guarantor on your note - or pay as much cash as you desired and the balance in a note. If the business continues to earn as it has - your note should be paid off within a year and leave you a nice sum besides. The thing adds up this way - I have to pay 2/3 of all I get out of the partnership profits for income tax. By selling you and Dick a half of my interest, my income tax liability is cut 50% and the income tax you and Dick would have to pay would still leave about $17,500 saving per year in income tax alone to the three of us. * * * "(3) Regardless of the figures and how much they indicate you would earn - the important decision is this - do you want to commit yourself at this time to looking forward *96 only to returning to take up work with me and my company. Leave the sentiment and all considerations aside except your own ideas and ambitions for the future. Naturally, I can transfer an interest to you; but I don't want to do it and have it sold or transferred to any other person. If at any time - in my lifetime - you did not want the interest in the business - I want that interest transferred back to me for the amount you paid for it or any equitable arrangement. When Jimmie is 21, I want to include him in the deal - if he wants to come in - in other words, he can then buy a 1/8 interest and then all four of us would have 12 1/2% each. "Will you please read and cogitate over this until you reach a decision in your own mind - then write me your wish. You can rest assured your decision either way will make no difference in my feeling for you - you have your life to live and I want you to live it as you think you will be happiest. * * *
"P.S. - I should explain that the $6250 which you would pay for 1/8 interest, will actually be for that amount of cash in the company. In other words - the capital of the company is $50,000 - all in cash - so if you ever elected to get out *97 - you would get the $6250 back. "I'd suggest you call me - collect - after you read and digest this so I can discuss any points I haven't made clear. "I might add - that this I hope can be my contribution toward helping you and Dick make up for time you may feel is being lost now, while you are in the armed services * * *." A few days after receiving the above letter Arthur telephoned his father that he was willing to purchase the partnership interest at the price specified. Sometime in January, 1944, decedent sold one-fourth of his 50 per cent interest in the partnership to each of his sons, Arthur and Richard. At that time the partnership's capital was $50,000. The selling price for the interest received by each son was its book value, $6,250, and each son paid decedent that amount in cash obtained by loan from Birmingham National Bank, secured by shares of General Motors Corporation stock supplied by Lucile. The loans were paid in full in August, 1944, from the partnership profits received by the sons. At the time of the transfers of partnership interests to them, Arthur was 26 and Richard was 21 years of age. James, the youngest brother, was only 16. An amended partnership *98 agreement was executed in January, 1944, providing in part: "4. Capital and interests of partners. The capital of the partnership shall consist of the sum of $50,000, and such additional money, property, contracts, assets and things of value as shall, from time to time, be acquired by the partnership. The interest of each partner in the partnership property, after the payment of all its liabilities, and, in the net profits from its operations, shall be as follows: "A. J. Brandt, twenty-five per cent; Arthur J. Brandt, Jr., twelve and one-half per cent; Richard M. Brandt, twelve and one-half per cent; L. F. Jubenville, twenty-five per cent; and Glenn C. Gillespie, twenty-five per cent." Arthur was released from the Army in January, 1946, and he thereafter became active in the partnership business where he has remained up to the present time. Upon his release from the Navy in the summer of 1946, Richard was active in the partnership business until February, 1947. In September, 1946, Arthur and Richard acquired the partnership interests of Gillespie and Jubenville, and are now the sole partners. Negotiations are pending for sale of Richard's interest to a cousin. In addition to *99 his widow and children decedent was survived by his mother, who is now 89 years of age, and three sisters, two of whom are older than decedent. His father had died of pneumonia at the age of 82. On April 13, 1940, decedent executed his last will which provided that his property should pass to his wife for use during her life and that the remainder should be held in trust for his sons and distributed to them when they reached the ages of 25, 30, and 35 years. Decedent was about six feet one inch tall and weighed about 190 pounds. He played golf at least one day each week. He played in January, 1944, while in San Diego, California, and in March, 1944, while in Fort Worth, Texas. His many business interests, including those connected with the partnership and with Consolidated Vultee, required that he travel extensively to plants throughout the country. His itinerary during the first three months of the year 1944 was as follows: Date
City
Jan. 2
Cleveland, Ohio
5
Detroit, Mich.
10
St. Louis, Mo.
11
Fort Worth, Texas
16
Tucson, Arizona
18-31
San Diego, California
Feb. 1-6
San Diego, California
7
Detroit, Michigan
14
New York, N. Y.
16
Philadelphia, Pa.
17
Washington, D.C.
18
Annapolis, Md.
20
Detroit, Mich.
22
Toledo and Cleveland, Ohio
25
Detroit, Mich.
Mar. 2
New York, N. Y.
4
Detroit, Mich.
7
Pittsburgh, Pa.
9
Cleveland, Ohio
10
Detroit, Mich.
26
New Orleans, La.
28
Marrow, La.
30
Fort Worth, Texas
Apr. 1
San Diego, Calif.
*100 After his arrival in San Diego on April 1, 1944, decedent was sick in bed continuously until about the middle of the same month when he and Lucile left for Cleveland, Ohio. Her brother, Dr. Edwin A. Hannum, was a practicing physician in Cleveland and had been decedent's doctor for many years. Decedent had made a practice of visiting Dr. Hannum for examination whenever he was in Cleveland on business. On May 2, 1933, he was admitted to the University Hospitals at Cleveland, with which Dr. Hannum was associated, to procure treatment for sore throat accompanied by a feeling of dizziness. Decedent also, at the same time, complained of backaches. Dr. Hannum discovered that decedent had a low basal metabolism rate for which he prescribed thyroid treatment. Dr. Hannum did not believe decedent's condition to be serious, but had him come to the hospital for basal metabolism tests whenever he was in Cleveland on business, in order to determine the proper dosage of thyroid. From X-rays Dr. Hannum determined that arthritic spurs, not of a serious nature, were causing the backache. Several years prior to the year 1944, Dr. Hannum discovered that the backaches were caused, at least in part, *101 by chronic prostatitis. That condition was common among men of decedent's age and was not considered serious. Prostatic massages as often as required to relieve the backaches were prescribed. Early in March, 1944, while in Cleveland on business, decedent visited Dr. Hannum who noted an enlargement of the prostate gland and advised him to consult Dr. John E. Williams, also of Cleveland. Dr. Williams diagnosed the condition as a moderate enlargement of the prostate gland, not regarded as serious. He advised periodic observation and prostatic massage. On March 17, 1944, petitioner consulted Dr. Reed M. Nesbit at Ann Arbor, Michigan, a nationally known specialist in urology. At that time Dr. Nesbit had X-rays made, and in a letter to decedent dated March 20, 1944, wrote: "I have seen your X-rays and they do not disclose any evidence of stones in your prostate gland so I have no advice other than that which I gave you when you were here; a periodic prostatic massage as is necessary for the alleviation of your back pain, a checkup examination here if you wish it in the event that you develop any increase of frequency of urination or difficulty with urination." When decedent arrived *102 in Cleveland from San Diego on April 14, 1944, Dr. Williams diagnosed his condition as acute prostatitis. On May 2, 1944, Dr. Nesbit was called into consultation. On May 19, 1944, Dr. Williams performed an operation removing most of decedent's prostate gland. On May 30, 1944, decedent died, the final diagnosis being cancer of the prostate. In a letter to Dr. Williams, dated June 19, 1944, Dr. Nesbit wrote: "I have your letter of June 14 and want to thank you for your final report about Mr. Arthur Brandt. Certainly a most interesting case and one that was very baffling in every respect and even in retrospect I view the thing as a most unusual situation. Certainly I have never seen a cancer that moved as fast as this one." As disclosed by the records of University Hospitals, decedent was admitted and discharged on the following dates: Admitted
Discharged
May 2, 1933
May 4, 1933
July 19, 1938
July 21, 1938
February 15, 1939
February 16, 1939
April 14, 1941
April 17, 1941
December 14, 1943
December 16, 1943
April 27, 1944
May 30, 1944
Medical science does not recognize any connection between prostatitis, such as decedent was believed to have had, and *103 cancer of the prostate. While in Cleveland in January, 1944, decedent ordered two suits of clothing for himself, at a cost of $295. During the latter part of the year 1943 the resignation of the chairman of the board of Consolidated-Vultee was anticipated, and plans were made for decedent's election as his successor. In connection with these plans, in January, 1944, decedent temporarily transferred his private secretary to Charles W. Perelle, Consolidated-Vultee's vice-president in charge of manufacturing, in an effort to persuade Perelle to remain with that company instead of accepting a competitor's offer. During the years 1943 and 1944 petitioner was making plans for his participation after the war in a program of industrial education for Chinese students brought to this country. In connection with plans for that program he corresponded between July 20, 1943, and April 1, 1944, with several Chinese officials and other persons. Decedent owned land in California on which he planned to develop placer mines. As disclosed by extensive correspondence with an attorney and a caretaker employed in connection with that project, decedent contemplated expenditure of substantial sums *104 of money for equipment and the purchase of additional mining property. Decedent kept scratch pad notes of things he intended to accomplish. On December 30, 1943, he noted "Things to do in 1944," as follows: 1. National Tool Co. a. Work out a refinancing program for elimination of V loan. b. Consider merger of Nat. Tool-McKerns Metals - Barber, Coleman & Fellows. c. Get first parallel tooth gear shaper cutter grinder built and process. d. Complete rebuilding of 3feet Rob grinders to cam driven type. e. Complete design and build first 8feet cam driver lob grinder. f. Complete design of optical profile grinders. 2. Engineering Co. a. Complete tool design work at Fort Worth on B-32 and B-36. b. Complete tool design work at Nashville on P-38. c. Complete tool design work at San Diego on B-24 and PB 4Y-2. d. Engineering of new products and plant for Hillenbrand. e. Engineering studies for post-war for Brown Shoe Co. - St. Louis, Mo.
f. Chinese post-war industrialization plan. g. Plant for manufacture of shotgun shells in Monterey, Mexico. h. Development of plans to operate dredge on canyon Placers property. i. Arrange for sale of 50% of my interest to *105 Art and Dick. j. Celotex Co. new plant layouts for Albert Kahn Co. 3. Consolidated Vultee Aircraft Corp.
a. Plan for change in top management and rearrangement of operating personnel. b. Procure Co. Carl Cover to head sales and development. c. Revamp engineering dept. d. Revamp directors. e. Renegotiation. f. Cancellation of contracts g. Post-war refunds. h. Post-war program. In their return petitioners reported a gross estate of $372,515.69, which did not include any amount for the partnership interests transferred by decedent to his sons. In his notice of deficiency respondent "held that the fair market value of the interest in Arthur J. Brandt Company, a co-partnership, conveyed to the decedent's two sons was $86,544.45 on the basic date, May 30, 1944, and should be included in the gross estate under the provisions of section 811 of the Internal Revenue Code. This value has been determined after giving due consideration to all relevant factors and elements affecting market value." The fair market value of the interests in question on May 30, 1944, was $12,500. Facts Relating to Value of Partnership Interest: The partnership earned *106 its income by performing engineering work under contracts with manufacturing firms. During the years 1938 to 1948, inclusive, the partnership rendered engineering services for an aggregate of about 37 firms. Its income for the years 1942 to 1948, inclusive, was as follows: 1944
Received From
1942
1943
First 5 mos.
Last 7 mos.
National Tool Co.
$ 15,000.00
$ 15,709.11
$ 6,250.00
$ 7,999.21
Smith, Hinchman & Grylls
Federal Foundries
4,294.25
Brewster Aeronautical
9,623.00
Convair - San Diego
189,801.44
217,138.46
63,723.04
51,600.84
Convair - Fort Worth
2,684.19
582,505.05
585,215.14
590,657.65
Convair - San Diego (A. J. Brandt)
35,334.20
8,606.12
Convair - New Orleans
31,861.09
Convair - Nashville
44,373.86
9,140.22
Vultee - Allentown
4,654.52
13,698.43
American Central
3,550.00
15,041.68
8,743.94
2,549.68
Libby Owens Ford
15,679.51
656.16
Parker-Wolverine
4,413.99
14,428.33
Ordinance Projects
271,057.35
40,730.87
Hillenbrand Industries
15,830.53
3,255.11
23,069.51
U.S. Rubber
3,375.00
Kelly-Springfield
23,957.37
Apex Electric
9,527.63
Celotex
9,891.18
6,315.40
McQuay-Norris
3,814.97
5,356.86
American Furniture
Anheuser-Busch
Somerville, Ltd
Hill Rom
Brazilian Military Comm.
Gar Wood
Segina
American Commission
M. W. Kellogg Co.
City of Denver
Hefco Laboratory
Projects under $2,000
1,542.25
360.00
Miscellaneous Projects
317.14
2,552.48
1,912.10
955.61
Tenants
3,745.99
Expenses Billed Customers
84,011.52
Total Income
$606,080.90
$1,016,816.75
$736,441.62
$707,172.61
*107 Received From
1945
1946
1947
1948
National Tool Co.
$ 8,269.27
$ 1,507.65
Smith, Hinchman & Grylls
$ 2,508.76
$ 6,077.13
Federal Foundries
Brewster Aeronautical
Convair - San Diego
21,586.35
Convair - Fort Worth
366,270.43
Convair -
San Diego (A.J. Brandt)
Convair - New Orleans
Convair - Nashville
871.47
Vultee - Allentown
American Central
Libby Owens Ford
Parker - Wolverine
Ordinance Projects
Hillenbrand Industries
19,602.03
13,858.06
6,455.35
U.S. Rubber
Kelly-Springfield
Apex Electric
23,636.36
9.25
Celotex
16,336.85
10,247.54
McQuay-Norris
40,456.59
10,250.50
American Furniture
7,617.31
Anheuser-Busch
12,182.00
8,699.20
Somerville, Ltd
875.52
16,082.10
Hill Rom
5,436.96
Brazilian Military Comm.
18,445.27
10,301.60
Gar Wood
3,285.00
261.30
Segina
2,499.25
American Commission
3,198.57
2,498.50
M. W. Kellogg Co.
1,128.81
City of Denver
1,626.19
Hefco Laboratory
1,660.75
Projects under $2,000
1,807.39
Miscellaneous Projects
1,758.92
7,544.38
2,978.17
118.65
Tenants
Expenses Billed Customers
Total Income
$517,463.10
$97,173.39
$28,203.00
$13,110.03
*108 The partnership net income for the years 1942 to 1946, inclusive, was as follows: Year
Net Income
1942
$247,957.25
1943
137,152.32
1944
183,258.50
1945
105,944.10
1946
13,056.30
As disclosed by its balance sheets for the years 1942 to 1946, inclusive, and May 31, 1944, the partnership had assets, liabilities, and total capital and surplus as follows: Total
Capital
and
Year
Assets
Liabilities
Surplus
1942
$183,499.66
$ 13,404.30
$170,095.36
1943
195,862.11
40,777.03
155,085.08
May 31, 1944
237,689.30
187,689.30
50,000.00
1944
189,683.42
139,683.42
50,000.00
1945
129,440.35
29,496.25
99,944.10
1946
29,559.61
27,573.69
1,985.92
The actual services for which the partnership was paid were rendered to the several manufacturing firms by engineers and clerical workers employed by the partnership and assigned to those firms. In the year 1944 the two largest projects were at the Vultee plants in San Diego and Fort Worth, where the partnership employed about 45 and 300 engineers, respectively. Decedent was the contact man, being well known among industrialists for his abilities in tool engineering. *109 In addition to his contact functions, decedent traveled extensively in visiting the projects. Neither Gillespie nor Jubenville was instrumental in securing contracts for the partnership. Gillespie was the legal adviser, and Jubenville was in charge of office administration and of negotiating contracts and employing engineers for projects in small arms plants. During the years 1943 and 1944, the partnership had three engineering contracts with Consolidated Vultee, hereinafter called the Vultee contracts. They required the partnership to serve as consulting engineer and to employ engineers and clerical workers for the Vultee plants at Fort Worth, San Diego, and Nashville. The Vultee-Fort Worth contract was executed on May 1, 1943, and was terminated on November 30, 1943. The partnership continued its work at Fort Worth throughout the year 1944, under the terms of the contract, on a monthly basis. The Vultee-San Diego contract was executed on November 30, 1943, and by its terms would terminate on November 30, 1944. It provided that Vultee would pay the partnership $2,550 per month in addition to reimbursement for expenses, on the assumption that Vultee would require the following approximate *110 man months of employees assigned by the partnership: Classification
Man Months
Supervisors
24
Tool engineers
0
Process man
48
Chief engineer
12
Loftsmen
0
Engineers
132
Clerical
0 Under the Vultee-Nashville contract, executed on January 15, 1944, and due to terminate on June 30, 1944, the partnership's monthly compensation in addition to reimbursement for expenses was $1,591, based upon the assumption that the following number of partnership employees was assigned to the Nashville plant: Superin-
Month
tendent
Engineers
Clerks
January
1
16
1
February
1
16
4
March
1
15
4
April
1
13
4
May
1
10
4
June
1
2
2
The Vultee contracts reserved to both parties the right of termination without cause upon 30 days' notice. The partnership's income from National Tool Company was received by decedent under a contract effective as of January 1, 1940, employing him as general manager of that company for a term of three years ending December 31, 1942. His salary under that contract was $12,000 per year and additional compensation if voted by the company's directors. On or about January 2, 1946, the estate having *111 been closed and the residue assigned to her pursuant to the terms of decedent's will, Lucile sold the 25 per cent interest which decedent had held at his death to the remaining partners for its book value of $12,500 and her share of undistributed profits. The terms of the transaction were embodied in an amendment to the partnership agreement dated January 2, 1946. The partnership capital was reduced from $50,000 to $35,000. Jubenville and Gillespie at that time each surrendered 5 per cent of his interest to the partnership in consideration of $2,000, reducing his capital investment to $10,500. Arthur and Richard each contributed additional capital in the amount of $750, increasing their respective capital investments to $7,000. The value of decedent's interest in the partnership as reported in the estate tax return was $25,150.54. Petitioners now admit that due to mathematical error the value was understated by the amount of $10,000 and should be $35,150.54. In computing that amount, petitioners added $12,500, being 25 per cent of the partnership's capital, and $22,650.54, being the amount after renegotiation of an account on the partnership books designated as an account payable *112 special to decedent. In his notices of deficiency respondent "held that the fair market value of the interest owned by the decedent in Arthur J. Brandt Company, a co-partnership, was $121,694.99, on the basic date, May 30, 1944, and should be included in the gross estate under the provisions of Section 811 of the Internal Revenue Code. "This value has been determined after giving due consideration of all relevant factors and elements affecting market value." The fair market value of decedent's interest in the partnership on May 30, 1944, was $35,150.54. Facts Relating to Joint Bank Deposit of Decedent and His Wife: Decedent and Lucile had a joint checking account in a Detroit Bank in which both made deposits. During the year 1943 and the first five months of 1944, decedent deposited $1,000 per month from his own funds as an allowance for Lucile and the payment of household expenses. In addition, decedent deposited money received as dividends on shares of stock owned by him. Lucile's deposits consisted of dividends on shares of stock owned by her, some of which were gifts from decedent and the remainder purchased by her with money from her monthly allowance. *113 The account's balance as of November 30, 1943, was $7,992.69. During the period from December 1, 1943, to May 30, 1944, decedent deposited $5,685.46 and Lucile deposited $10,209.54. During the same period checks in the aggregate amount of $15,816.24 were drawn against the account, being in payment of the following items: Items
Payments
Pictures (gifts)
$ 146.79
Bonds (for Lucile)
375.00
Insurance (household)
133.09
Unclassified
45.81
Contributions (decedent and Lucile)
651.00
Club dues (decedent)
872.58
Maid
717.75
Newspapers and magazines
105.72
Insurance (Lucile's life)
438.90
Insurance (decedent)
1,024.03
Clothing (Lucile)
2,224.24
Taxes (on family residence)
275.96
Food and automobile
1,406.65
Utilities (household)
589.99
Medical (decedent)
1,613.35
Miscellaneous household
402.78
Jewelry
3,006.28
Personal (decedent)
1,040.55
Dry cleaning and laundry
79.50
Brandt children tuition
666.37
Total
$15,816.24
As of May 30, 1944, the joint account in the Detroit Bank had a balance of $8,263.95. In their return petitioners included $2,293.91 of that amount in the gross estate. They now assert that this was error and claim nothing *114 should be included. Respondent has determined that the entire balance of $8,263.95 "should be included in gross estate under the provisions of section 811(e) of the Internal Revenue Code." Of the $8,263.95 balance in the account on May 30, 1944, $2,450 represented the net amount contributed by decedent. Facts Relating to Savings Accounts: On December 15, 1943, decedent opened two savings accounts in a Detroit Bank. On the bank's signature cards, those accounts were in the names of "James Andrew Brandt, by A. J. Brandt" and "Richard Martin Brandt, by A. J. Brandt." Both James and Richard were minors at the time the accounts were opened. The bank regarded the accounts as "Minor Child Trustee Accounts," under control of decedent as trustee. He could have withdrawn funds from them solely upon his own signature. On the reverse side of both signature cards appeared the following provision: "IT IS HEREBY STIPULATED that all funds now or hereafter standing at credit of the undersigned, in their joint names, in THE DETROIT SAVINGS BANK, under its savings Department passbook , are and shall become the property of the undersigned as joint tenants, and shall be *115 payable to either, or to the survivor of them, under terms of section 3 of Act No. 248 of the Public Acts of 1909 of the State of Michigan, and subject to the Rules of the Bank governing deposits." In line with its regular practice, at the time the accounts were opened the bank stamped the words "SURVIVORSHIP CLAUSE VOID" beneath the above provisions on both signature cards. Pages 8 and 9 of the Savings Operational Manual used by the Detroit Bank contains the following: "22. In the case of the death of an individual trustee, or the surviving trustee, if there are two, the Bank will pay the funds in the account to the beneficiary in accordance with Section 12062, Compiled Laws of Michigan for 1929. This section is quoted as follows: Trust deposit; payment to beneficiary on death of trustee, exception, receipt. Section 2. When any deposit of money shall be made in any bank or trust company by any person in trust for another, and no other or further notice of the existence and terms of a legal and valid trust shall have been given in writing to the bank, in the event of the death of the trustee, the same, or any part thereof, together with the dividends or interest thereon, *116 may be paid to the person for whom the deposit was made: Provided, however, that if the balance on such deposit shall exceed One Hundred (100) Dollars and such person shall be under the age of eighteen (18) years, the same may be paid only to his or her legally appointed guardian * * *. "The status of an account once opened must not be changed except by closing the old account and opening a new one. "As long as the trusteeship exists the minor child will have no control over the account. If the child reaches his majority and the trustee desires to give the child control of the money, he must close the account by withdrawing the funds over his signature as trustee and turn the money over to the child. "If at some time before the child reaches his majority the trustee feels that the child has sufficient discretion to have control over the funds in the account, he may accomplish this by closing out the trusteeship account and opening a new account in the child's name alone. * * *" All deposits in the two savings accounts were either gifts to James and Richard from various members of the family, including decedent, or money earned by the boys during summer vacations. As of May 30, 1944, the *117 accounts had balances of $2,600.45 (James) and $1,981.12 (Richard). In their return petitioners did not include any amount representing either account in the gross estate. In his notice of deficiency respondent determined that the above balances as of May 30, 1944 "should be included in gross estate under the provisions of section 811(e) of the Internal Revenue Code." Opinion A question common to the first two phases of this estate tax controversy is the value to be placed upon decedent's interests in his engineering partnership. The second issue relates solely to the includible value of the partnership share which decedent retained and held at his death; and the first necessitates an examination of whether the payment he received from his two sons for transfers to them of partnership interests during his lifetime represents the fair value of what they received, for if so, there being no question of the good faith of the sale, the presence of "adequate and full consideration" would eliminate further consideration of the applicability of section 811(c) and (d), Internal Revenue Code. [2]
*118 But the inquiry may be narrowed even further. What the estate returned as the value of decedent's share in the partnership and what the sons paid to decedent for their partnership interests represents the proportion of tangible assets included in each share, concerning the value of which there is no dispute. The real question in both instances is the existence of earning power or intangible elements, comparable to good will, which would lend added worth to the bare physical properties. Cf. Estate of Leopold Kaffie, 44 B.T.A. 843. We think a solution of that problem will dispose of both issues. It is reasonably apparent that decedent's was a personal service business, obtained and dispatched almost entirely by reason of his contacts, reputation, and ability as an engineer. The partnership held no contract binding him to continue to contribute those indispensable services. It is hence inconceivable that an arms-length purchaser would have been willing to pay for the business a price based on the earning capacity of an individual partner, free to discontinue his association at any time. And that the partnership profits were indeed the earnings of decedent is conceded *119 by respondent when he says: "* * * the two sons of the decedent are not partners for Federal income tax purposes and * * * all of the income of the family group would be taxable to the decedent who earned it." That this was a partnership does not, of course, negative the existence of good will. See Estate of Leopold Kaffie, supra. But that it was a family partnership in which the father may have been satisfied to permit his sons to benefit from his own earning power, whatever its effect on income tax liability - see W. M. Mauldin, 5 T.C. 743, affirmed (C.C.A., 4th Cir.), 155 Fed. (2d) 666; but cf. Claire L. Canfield, 7 T.C. 944, reversed (C.C.A., 6th Cir.), 168 Fed. (2d) 907 - would have had an exactly contrary influence on the value of the partnership property to a stranger. He could not expect decedent's paternal generosity to continue to lend uncompensated value to the business. And there were, moreover, no local place of business to which customers would continue to resort, no contracts with clients that could not be terminated on short notice, no valuable patents, formulae, trade names nor copyrights controlled *120 by the enterprise. Cf. William H. Gross, 7 T.C. 837. Under these circumstances what we said in Willoughby J. Rothrock, 7 T.C. 848, 858, seems to us dispositive: "* * * The issue, as we see it, narrows to whether the prospective earnings of the sons were attributable purely to personal services, or partly to the contribution made by the existence and continuation of a going concern - in other words to a share in presently valuable business prospects, comparable to good will, which being the property of the old partnership was in some measure transferred to them as members of the new firm. "It is not requisite to put too fine a point upon the principle involved in that distinction. If in fact there were no future earnings inherent in the business itself, it matters little whether we say, as a matter of law, there was a gift, see William H. Gross, supra, but its value was so negligible as to eliminate it from practical consideration; or the value being absent, the consideration passing could not fail to be full and adequate; or, there being no existing vehicle for the transmission of future earnings in such a purely personal service business, *121 cf. Tinkoff v. Commissioner (C.C.A., 7th Cir.), 120 Fed. (2d) 564; Thomas M. McIntyre, 37 B.T.A. 812, there was nothing which could be the subject of a gift. On any approach the result is identical. "Our interpretation of the evidentiary facts leads us to the ultimate finding that petitioners have borne their burden of showing that the business by itself possessed no substantial element of future earning power or good will, but that, on the contrary, its income was derived primarily from personal services, so that different participants with similar abilities, experience, and contacts could have organized a comparable venture and enjoyed a parallel success from their contribution of time, skills, and services. * * *" That was said, it is true, in a gift tax case. But gift and estate taxes are said to be in pari materia, Sanford's Estate v. Commissioner, 308 U.S. 39, and the question involved in the Rothrock case was manifestly identical with this one; more nearly so, in fact, than such estate tax cases as Estate of Leopold Kaffie, supra. The issue here, as in Willoughby J. Rothrock, supra, concerns the value of earning *122 power not only at the death of a principal partner, but also upon his transfer of an interest while he remains alive. On that issue the facts give the Rothrock case controlling weight. The accuracy of this outcome is reinforced if we resort, as we may for confirmation, see Henry Hudson, 39 B.T.A. 1075, 1096, to the history of the business subsequent to decedent's death. We find, as might be expected, that from annual net earnings of $183,000 and a net worth of $50,000 in the year of decedent's death, the business dropped to a net income of $13,000 and net worth of less than $2,000 in the second year following. The only change which adequately accounts for this radical deterioration is the removal from the scene of the three senior partners, particularly of the great earning power of decedent's personal contribution; for respondent concedes that the end of the war was not the cause of the decrease in activity when he says in his brief: "Balanced against this hazard there must be taken into account the fact that after the termination of the war there would be a definite need and demand for engineering services of the type performed by the A. J. Brandt Co. in connection *123 with reconversion * * *." Nor is this disposition precluded by Rodney B. Horton, 13 T.C. 143 (July 27, 1949). That the actual sale of good will of a personal service business may show it to have a value which a willing purchaser would pay for it, does not prohibit the finding as to another business, and in the absence of such a sale, that no valuable good will exists. See Estate of Leopold Kaffie, supra; Willoughby J. Rothrock, supra.We have accordingly found as a fact that the tangible assets of the business, as paid for by decedent's sons and as returned by the estate, allowing for petitioner's conceded mathematical error, was the limit of its worth, and dispose of the first two issues accordingly. The third issue reduces to a narrow controversy as to the factual inferences to be drawn from the record. We have made an ultimate finding on the subject. It seems to be agreed that whether any part of the bank account in the joint names of decedent and his wife is includible in the estate depends on the extent to which it has been shown that the contents on the date of death originated with the wife. [3] The source of the deposits being largely *124 known and in effect stipulated, the dispute involves the identity of the withdrawals; that is whether what was paid out of the account in the six months prior to decedent's death were his deposits or hers. The origin of the contents of the account at the beginning of the six-month period is not adequately shown. We must accordingly assume that it was contributed by decedent. Estate of Henry Wilson, 2 T.C. 1059. Adding that to decedent's conceded deposits, and attributing to him the withdrawals which the record seems to us adequately to identify as his, leaves the amount includible which we have incorporated in the findings. See Estate of Ralph Owen Howard, 9 T.C. 1192, 1203. *125 On the final issue, respondent's position seems to be predicated upon the effect of Michigan law upon the savings deposits made by decedent in the names of his two minor sons. Referring to the clause on the back of the signature cards he points to the portion which designates the "undersigned" as "joint tenants" and to the provision for payment under section 3 of Act No. 248, Michigan Public Acts of 1909, which in turn (17 Mich. Statutes Ann., § 23.303) deals with deposits which are "in form to be paid to either or the survivor of them." The provision of this statute that the account "may be paid to the survivor after the death of one [1] of them" is urged as bringing both accounts within the provision [4] of section 811(e) as payable "to either or the survivor." The difficulty we find with this line of reasoning is that it stems from language which the parties, decedent and the bank, agreed would be "void." There being no survivorship clause, it is impossible to conclude that the deposit was payable to the survivor within the meaning of section 811(e). It might have been open to respondent to proceed on the theory that the sons attained no interest *126 whatever, or that a trust, if created at all, was either intended to take effect at death or subject to change or revocation by decedent, under sections 811(c) and (d), see Estate of John Howard Helfrich, 1 T.C. 590, affirmed (C.C.A., 7th Cir.), 143 Fed. (2d) 43; or even that the transfers were made in contemplation of death. But respondent's position is limited to the application of the survivorship aspect of section 811(e), and in effect concedes that some interest was vested in the sons. He does not even suggest that the gift was invalid under Michigan law. Cf. Estate of John Howard Helfrich, supra. Under the circumstances we do not think petitioner should be called upon to negative all the arguments that might have been advanced but have not been, Helvering v. W od, 309 U.S. 344; Helvering v. Cement Investors, Inc., 316 U.S. 527; particularly such as might depend upon an exhaustive survey of State authorities. Cf. Helvering v. Fuller, 310 U.S. 69. On this issue as presented, we conclude that the savings accounts are not includible in the gross estate. There is apparently no dispute as to transferee and fiduciary *127 liability. A number of items having been conceded, Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Glenn C. Gillespie; Lucile M. Brandt; Lucile M. Brandt, Transferee; Arthur J. Brandt, Jr., Transferee; Richard M. Brandt, Transferee; and James A. Brandt, Transferee.↩
2. "SEC. 811. GROSS ESTATE. "The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States - * * *
"(c) Transfers in Contemplation of, or Taking Effect at Death. - To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, or of which he has at any time made a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this subchapter; "(d) Revocable Transfers. - "(1) Transfers After June 22, 1936. - To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death; * * *↩
3. "SEC. 811. GROSS ESTATE. * * *
"(e) Joint Interest. - "(1) To the extent of the interest therein held as joint tenants by the decedent and any other person, or as tenants by the entirety by the decedent and spouse, or deposited, with any person carrying on the banking business, in their joint names and payable to either or the survivor, except such part thereof as may be shown to have originally belonged to such other person, and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth; * * *"↩
4. See footnote 3, supra.↩